UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARELL DEON CHANCELLOR,

        Plaintiff,                Case No.  03-40344

                                 District Judge Paul V. Gadola
v.                            Magistrate Judge R. Steven Whalen

CITY OF DETROIT,
a Municipal Corporation,
P.O. WILLIAM "ROBO COP" MELENDEZ,
P.O. TROY BRADLEY, P.O. JEFFREY WEISS,
Individually and in their official capacity and
CMDR. CHARLES BARBIERI, in his official capacity,
jointly and severally,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

      This is a civil rights case brought pursuant to 42 U.S.C. §1983 and a number of

Michigan state law theories.  Before the Court are the following three motions that have been

referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B): (1)

Renewed Motion for Summary Judgment by Defendant City of Detroit [Doc. #102]; (2)

Motion for Summary Judgment by Defendant Troy Bradley [Doc. #103]; and (3) Motion to

Dismiss and/or Summary Judgment by Defendants William Melendez and Jeffrey Weiss

[Doc. #104].  The Court has reviewed all of the pleadings and exhibits, and oral argument

was conducted on August 24, 2006.  For the reasons set forth below, I recommend that all

three motions be GRANTED IN PART AND DENIED IN PART, as follows: that summary judgment be GRANTED as to Plaintiff's claim that the Defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment; and that the motions for summary judgment be DENIED in all other respects.

## I.   FACTUAL BACKGROUND

This case arises out of the Plaintiff Darryl Chancellor's arrest on April 22, 2002 by Defendant Detroit Police Officers William Melendez (a/k/a RoboCop), Jeffrey Weiss and Troy Bradley.  As a result of that arrest, the Plaintiff was charged, first in state court, with being a felon in possession of a firearm, and later by way of indictment in this Court with the analogous federal offense, 18 U.S.C. §922(g).  Subsequently, Melendez, Weiss and Bradley themselves were also indicted, along with 14 other Detroit Police Officers, for conspiring to violate the civil rights of citizens in Detroit's Fourth Precinct, in violation of 18 U.S.C. §241. One of the overt acts in this conspiracy charge was the April 22, 2002 arrest of the Plaintiff. Specifically, Paragraph 17 of the Indictment reads:

> "17.  On April 22, 2002, on Clippert Street, WILLIAM MELENDEZ, TROY BRADLEY and JEFFREY WEISS subjected Darryl Chancellor and Robert Blackwell to unreasonable searches and seizures.  MELENDEZ arrested Chancellor based on MELENDEZ's false claim that he saw Darryl Chancellor throw a firearm to the ground.  MELENDEZ, BRADLEY and WEISS wrote false reports justifying the arrest of Chancellor."

The facts–or more precisely, the various competing versions of the facts–are reflected in the Complaint, depositions of the Plaintiff and the Defendants, police reports, affidavits, and documents related to the criminal prosecution of the Defendants.

### The Complaint

Plaintiff alleges that on April 22, 2002, he was in a parked car with three other people when they saw Defendant police officers drive by in an unmarked vehicle.  The Plaintiff, who was in the front passenger seat, got out of the car with the others, and walked away with Robert Blackwell.  The other two men ran.  *Complaint*, ¶¶ 9, 14-16.  Defendants Bradley and Weiss chased the other two, but they were never caught.  Defendant Melendez arrested the Plaintiff and Blackwell.  *Id.,* ¶¶ 18, 20.  Plaintiff alleges that one officer claimed to have produced a gun from the back seat of the car, and a second officer said that he found a gun between some houses on Clippert Street.  Defendant Melendez said, "Now you both have guns," and laughed.  *Id.*, ¶¶ 26-28.

On May 6, 2002, a federal criminal complaint and warrant charging felon in possession of a firearm (FIP) were signed, and on May 14, 2002, the Plaintiff was indicted on that charge.  *Id.*, ¶¶ 29-30, 32.  The Plaintiff was ordered detained, and spent 213 days in jail before the government moved for dismissal of the complaint on November 26, 2002.  *Id.*, ¶¶ 34-35, 37.

Plaintiff alleges that there is a history of citizen complaints against  Defendant officers, involving frivolous or fake criminal charges, and that these complaints were made to and known by Defendant City of Detroit, as well as the Detroit Police Department and supervisory personnel at the Fourth Precinct.  *Id.* ¶¶ 38-39.  In his Complaint, Plaintiff alleges a violation of his constitutional rights under the Fourth and Fourteenth Amendments,

-3-

supporting a cause of action under 42 U.S.C. §1983 (Count I)[1]; False Arrest and Imprisonment (Count II); Civil Conspiracy (Count III); Intentional Infliction of Emotional Distress (Count IV); Malicious Prosecution (Count V); and Abuse of Process (Count VI).

**The Police Reports**[2]

In his preliminary complaint report (PCR), written after the Plaintiff's arrest, Defendant Melendez stated that on the night in question, he saw a blue Oldsmobile make a left turn on Clippert Street without signaling, and conducted a traffic stop for that reason. He saw the Plaintiff jump out of the car and flee on foot, and he stated that he saw the Plaintiff reach into his waistband and toss a "BSR" (black steel revolver) onto the front lawn of 3628 Clippert. He then arrested the Plaintiff. Melendez also stated that Defendant Weiss searched Robert Blackwell, and found a gun in his right waistband.

Defendant Weiss's PCR contained virtually identical language concerning the traffic stop and the seizure of a gun from Blackwell.

Defendant Bradley's PCR also contains similar language, including the basis of the alleged traffic stop. Bradley stated that he himself recovered the gun from the front lawn of 3628 Clippert.

The police reports also include an Interrogation Record of both Plaintiff and Robert

---

[1]The Fourteenth Amendment claim includes allegations of both Due Process and Equal Protection violations.

[2]The police reports are attached to Defendant Bradley's summary judgment motion [Docket #103] as Exhibits 10 (Bradley), 11 (Melendez) and 12 (Weiss).

Blackwell, recounting statements those two individuals allegedly made to the police after their arrest.[3]  Plaintiff did not write his own statement; rather, it is handwritten in the third person, presumably by a police officer, and signed by the Plaintiff.  The statement indicates that Plaintiff and his companions were parked on Clippert Street when the police drove by. It states that at that point, Plaintiff got out of the car and started walking away, when he was arrested.  The statement indicates that the police took a gun from the car, and found a second gun from behind a house on Clippert, but it is not apparent that that part of the statement was based on personal observation or knowledge.

Blackwell's statement to the police also states that when the people in the car saw the police, they exited the vehicle and attempted to leave the scene.  The statement indicates that the police found no weapons or contraband on his or Plaintiff's person, but "they got a gun from the back of Boo (sic) house and a gun out of my backseat where Terrance was sitting. They told us to tell Terrance thank you for the gun."  Blackwell stated that he did not see Terrance Hall or anyone else with a weapon in the car that night, but that he knew the gun the police showed him was Terrance's because he had "seen the weapon in Terrance Hall (sic) hand before."

---

[3]*See* Exhibits 8 and 9 to Bradley's summary judgment motion.

## The Depositions[4]

<u>Melendez</u>

Defendant Melendez testified unequivocally that on the night in question, he made a traffic stop of the Oldsmobile. He described the whole Fourth Precinct as a "high crime area." He said that he did not recognize any of the occupants of the car as having criminal backgrounds until after the arrests, nor did he see the Plaintiff well enough to recognize him until after he was arrested.

<u>Bradley</u>

Contrary to Defendant Melendez's testimony, Defendant Bradley testified at his deposition that there was no traffic stop. Bradley conceded that this portion of the police reports was a lie. He also testified that his statement in the PCR that he recovered the gun from the lawn was false. He said that he "believed" a gun was found on the lawn, but he did not know by whom. His "partner" told him that the Plaintiff had tossed a gun onto the lawn, but Bradley that he himself never saw the Plaintiff with a gun.

Bradley testified that the Oldsmobile was parked on Clippert Street, near a bar that had been the victim of an armed robbery, and that he recognized the Plaintiff as someone who had previously robbed people at gunpoint. He said that he observed the Plaintiff walking away from the car at a fast pace, and that after Plaintiff and Blackwell were arrested, he stayed at the car with them. Defendants Melendez and Weiss left, but he could not see

---

[4] *See* Bradley's summary judgment motion, Exhibits 3 (Melendez's deposition), 7 (Bradley's), 4 (Plaintiff's first deposition) and 14 (Plaintiff's second deposition).

what they were doing.

Plaintiff

     The Plaintiff was deposed twice, first on March 1, 2005 and again on October 17, 2005.

     At the March 1st deposition, Plaintiff testified that he was in the car with Terrrence Hall, Robert Blackwell, and an individual known as "Boo." He and Blackwell were searched incident to their arrests, but no weapons or contraband were found. Melendez told Bradley that he was going to search the car, but Plaintiff could not see Melendez because his back was to him. He said that "Robo Cop" (Melendez) came back with a 9 mm pistol and told Blackwell it was his. Melendez came back again with another gun, threw it on the hood of the car, and told Plaintiff it was his.

     At his October 17th deposition, Plaintiff testified that he and his companions were in the car parked when the Defendants drove by. Weiss was driving the police vehicle, with Melendez in the passenger seat and Bradley in the rear. He said that everyone got out of the car "because it was Robo Cop."

     After their arrest, Plaintiff and Blackwell were frisked by the back of the car. Plaintiff testified that Melendez said nothing about finding guns at that point. Plaintiff and Blackwell were handcuffed and placed on their knees. Melendez then went behind them and then returned, saying he had found a gun. He told Blackwell it was his gun, and that he found it in the car. Then, Melendez and Weiss walked off again, but Plaintiff could not see where they went. (Bradley was watching Plaintiff and Blackwell during this time). Melendez and

Weiss returned 10 or 15 minutes later, and Melendez put another gun on top of the car, saying, "Chancellor, this is your gun."  Plaintiff testified that he did not recognize the gun, and told Melendez that he did not own a gun, to which Melendez replied, "I'm going to say it's your gun."

Plaintiff testified that while being transported to the precinct, he argued with Melendez about the gun, and that Melendez said to "shut the F up before he put some dope on me too."

### The Indictment[5]

Defendants Melendez, Weiss and Bradley were all indicted by a federal grand jury on June 19, 2003.  The conspiracy charge included allegations of falsifying police reports, committing perjury in court testimony, and covering up for other officers.  The Indictment charged 11 specific overt acts against Melendez, seven against Weiss, and five against Bradley.  Each overt act represented a separate incident and date of serious police misconduct, and, as noted above, ¶ 17 included the incident with Plaintiff Chancellor, charging that Melendez lied when he claimed he saw Plaintiff throw a gun to the ground, and that Weiss and Bradley "wrote false reports justifying the arrest of Chancellor."

### Bradley's Rule 11 Plea Agreement[6]

Defendant Bradley pled guilty to the Indictment, and specifically admitted that in

---

[5] *Id.*, Exhibit 13.

[6] *Id.*, Exhibit 15.

-8-

Plaintiff's situation, he knowingly signed a false police report.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate.  *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial

of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III.   ANALYSIS

#### A.   The Section 1983 Count

It's about the gun. Specifically, it's about the gun alleged to have been found on the lawn on Clippert Street, the gun that formed the basis of the felon in possession charge against the Plaintiff, a charge that resulted in him spending 213 days in jail before the government dropped the case.

Common to all three summary judgment motions is the argument that whatever lies were told about the "traffic stop," and regardless of whether Bradley lied about recovering the gun from the lawn, it doesn't matter, because, after all, *someone* eventually found that gun, and therefore there was probable cause to arrest and charge the Plaintiff. However, this argument misses the point, because there is a clear question of fact as to whether a gun was really found on the lawn–or for that matter, in the blue Oldsmobile–or whether Melendez and his cohorts planted the gun as false evidence.

With that in mind, the three motions will be discussed separately.

-10-

### Melendez and Weiss [Docket #104]

In their PCR's Melendez and Weiss both claimed that the blue Oldsmobile was stopped for the traffic offense of failing to signal a turn.  They claim that other factors, including seeing known criminals flee the police in a high crime area, gave them reasonable suspicion to make an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the discovery of the guns gave them probable cause to arrest Chancellor and Blackwell.

Of course, there is an obvious question of fact as to whether there was really a traffic stop, with Melendez saying there was (both in his police report and at his deposition), and the Plaintiff and Defendant Bradley saying there was not.  There is also a question of fact as to whether the Plaintiff ran from the scene (as Melendez claims) or walked at a fast pace (as Bradley said in his deposition).  However, even if there was no traffic stop, case law does support the principle that unprovoked flight (either running or walking fast) in a high crime area where a recent armed robbery took place can give rise to reasonable suspicion to make a *Terry* stop.  *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).  Walking or running, the Plaintiff concedes that he left the scene when he saw the police.  Therefore, the Court will assume for purposes of this discussion that there was a valid *Terry* stop.[7]

_____

[7]While the question of whether there was really a traffic violation is not determinative of the validity of the *Terry* stop, Bradley's admission that he, Melendez and Weiss lied about the stop in their PCR's has a significant impact on the Defendants' credibility as to other statements, such as whether a gun was found.

The more important question is whether Plaintiff was seen to toss a gun on the ground, or whether a gun was actually recovered from the lawn. If the gun was planted by the police, then "probable cause" was fabricated, and the Defendants' argument for summary judgment crumbles. The following portions of the record reveal a clear question of fact as to whether the Plaintiff ever had a gun.

(1) At his deposition, Plaintiff testified that he told Melendez that the gun allegedly found on the lawn was not his gun, and that he did not own a gun. This does not contradict Plaintiff's "statement" to the police, where he is reported to have said that the police found a gun behind a house on Clippert. As corroborated by subsequent testimony, discussed below, the Plaintiff was not speaking from personal knowledge–he did not see the gun being retrieved from the lawn, and said that he had never seen the gun before Melendez showed it to him–but rather was reporting what Melendez told him. Thus, there is a material evidentiary conflict between Melendez's and Plaintiff's testimony.

(2) The Plaintiff also testified at his deposition that Melendez all but admitted to planting the gun. He said that when he protested his lack of knowledge about the gun, Melendez said he was "going to say it was [Plaintiff's] gun," and told him to "shut the F up before the put some dope" on him too. This further shows a contested question of material fact between the Plaintiff and the officers.

(3) Furthermore, neither Bradley nor Weiss provide any credible support for Melendez's claim that the Plaintiff tossed a gun, or that a gun was even found on the Clippert Street lawn. Bradley, who stated in his PCR that he retrieved the gun from the lawn,

admitted in his deposition and in his own plea agreement that this was a lie.  Moreover, he has no personal knowledge of anyone retrieving the gun.  He testified at his deposition that although he "believed" a gun was found, he was only relying on what his "partner" (presumably Melendez) told him.  He conceded that he never saw the gun before Melendez produced it, and stated that while he was guarding the Plaintiff and Blackwell at the rear of the car (while Melendez and Weiss were purportedly looking for the gun), he could not see where his partners went[8]

(4)  In addition, the grand jury that indicted these Defendants necessarily found probable cause that in Plaintiff's case, as well as others, the officers violated numerous constitutional rights, lied in their police reports, and specifically that Melendez lied about seeing the Plaintiff toss a gun:

> "MELENDEZ arrested Chancellor *based on MELENDEZ's false claim that he saw Darryl Chancellor throw a firearm to the ground.*  MELENDEZ, BRADLEY and WEISS *wrote false reports justifying the arrest of Chancellor.*"  (*Indictment*, ¶ 17) (emphasis added).

Obviously, the grand jury's finding of probable cause was based on *evidence*.

---

[8]There is a similar question of fact as to where the gun allegedly seized from Blackwell was actually found, or whether it too was planted by the police.  Weiss and Melendez asserted in their PCR's that a gun was taken from Blackwell's waistband. In their statements to the police, Blackwell and the Plaintiff indicate that they were told the gun was taken from the back seat of the car.  Although Blackwell told the police, when shown the gun, that it belonged to Terrance Hall, the veracity of that statement is suspect given the "recognized motivation to shift blame onto others."  *Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).  Thus, a reasonable inference arises that Blackwell never saw the gun before Weiss produced it, and being led to believe it was found in the back seat of the car, shifted the blame to Hall (who had escaped from the police) in order to distance himself from the weapon.

-13-

Without suggesting that the concepts of "probable cause" and "preponderance of the evidence" are necessarily coextensive, it is nevertheless apparent that the same evidence that supported the indictment creates a material question of fact as to the accuracy of the Defendants' version of events in the present case, particularly with regard to whether the Plaintiff ever had a gun[9]

(5) The criminal indictment (again based on the grand jury's finding of probable cause) lists, in addition to the events related to Plaintiff Chancellor, 10 separate overt acts on the part of Melendez, six on the part of Weiss, and four on the part of Bradley. These acts involved the Defendants routinely falsifying police reports, planting evidence and committing perjury. Each of these other incidents would be admissible as substantive evidence under Fed.R.Ev. 404(b), as similar acts showing intent, plan, knowledge, scheme or motive. This Rule 404(b) evidence creates an issue of material fact.

These contested issues of fact on the critical issue in this case–whether the Defendants planted the gun and made up a story about how they found it–preclude summary judgment on the §1983 claim as to Melendez and Weiss.[10]

_____

[9]The Court recognizes that Defendants Melendez and Weiss were found not guilty at their criminal trial. However, because the standard in a criminal case is proof beyond a reasonable doubt, the highest evidentiary standard in law, the Defendants' acquittal carries no weight in the present civil case, where the standard is only preponderance of the evidence. Bradley, of course, pled guilty to Count One of the indictment (conspiracy to violate civil rights).

[10]In addition to claiming a Fourth Amendment violation, Plaintiff's §1983 count also alleges violations of Fourteenth Amendment Due Process and Equal Protection. To establish an Equal Protection claim, a Plaintiff must allege and prove "that he was denied equal

**Bradley [Docket #103]**

The evidence does not show that Defendant Bradley was directly involved in procuring the gun that formed the basis of the felon in possession charge against the Plaintiff. Both at his deposition and his guilty plea, of course, Bradley recanted his false statement that he had recovered the gun from the lawn. In his summary judgment motion, Bradley essentially takes the position that his lies were inconsequential, in that they had no bearing on the ultimate probable cause determination that resulted in Plaintiff's arrest.

There is no merit in this position. Like his co-defendants, Bradley assumes incorrectly that a gun was in fact recovered from the lawn, and therefore that the probable cause finding was unaffected by his mendacity. However, as discussed above, there is a clear question of fact as to whether the gun was the Plaintiff's, or whether it was planted by Melendez and/or Weiss, with Bradley's tacit approval. The grand jury that indicted these Defendants found that Melendez lied about seeing the Plaintiff toss a gun. Bradley's admittedly false PCR, indicating that *he* recovered the gun from the lawn, corroborated Melendez's statement that he saw the Plaintiff throw the gun to the ground. Since Bradley did not personally observe anyone find the gun on the lawn, why would he lie about finding it himself, except to support

---

protection of the law based upon an unjustifiable standard such as race, religion, or other arbitrary classification . . . . [A] person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Bass v. Robinson,* 167 F.3d 1041, 1050 (6th Cir. 1999). As Plaintiff has made no allegation or showing that the officers' misconduct was class-based, the Equal Protection claim must be dismissed.

-15-

what he knew to be his and his coconspirators' scheme to concoct false charges?[11]

In addition, the ATF report that recommended Plaintiff's federal prosecution[12] specifically lists "Preliminary Complaint Report of Police Officer Troy Bradley, Detroit Police Department" under the heading "Documents Submitted in Support of Prosecution." This creates, at the least, an obvious question of fact as to whether Bradley's false police report materially and substantially resulted in Plaintiff's claimed injuries.

Because the probable cause finding was factually questionable, and because there was a direct causal link between Bradley's lies and the Plaintiff's prosecution and incarceration, those lies cannot be considered inconsequential. Like his codefendants Melendez and Weiss, Bradley is not entitled to summary judgment because there are questions of material fact as to his liability under §1983.

### Qualified Immunity re: Melendez, Weiss and Bradley

All three individual Defendants assert that they are entitled to qualified immunity. Under these facts, they are not.

_____

[11]This gives particular force to the Rule 404(b) evidence arising from the four other overt acts charged in Bradley's indictment. (As was the case with his co-Defendants, the substantive use of the overt acts as Rule 404(b) evidence may be considered in determining whether there is a question of material fact sufficient to withstand summary judgment). In addition, both in his motion and at oral argument, Bradley made much of the fact that although he signed the PCR, he did not write it himself. If anything, this fact supports an inference that Melendez wrote the false statement that Bradley recovered the gun, and that Bradley signed off on the report in complicity with Melendez, as part of their usual scheme or practice of constructing false charges.

[12] Attached to the Complaint as an exhibit, Bates No. 01597-01598.

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that a state official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendant violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful.  The Court has also held that qualified immunity " 'provides ample support to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed*, 500 U.S. 478, 494-95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6ᵗʰ Cir. 2002), the Sixth Circuit set forth a three-part test to determine whether a government official is entitled to the defense of qualified immunity: (1) was there a violation of a constitutionally protected right; (2) was that right clearly established at the time; and (3) has the plaintiff alleged and shown by sufficient evidence that what the official allegedly did was objectively unreasonable?[13]

Because the Defendants' qualified immunity claim is based on the false premise that their probable cause determination was unassailable, it rests on a foundation of sand.  The

---

[13]Since *Saucier*, the Supreme Court has continued to use the two-prong analysis.  The Sixth Circuit's addition of the third "objective reasonableness" prong is not substantially different, but "may in some cases increase the clarity of the proper analysis." *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 311, fn. 2 (6ᵗʰ Cir. 2005).  In cases where, as here, if the right is clearly established its violation would necessarily be objectively unreasonable, the Court has "collapse[d] the second and third prongs"in order to "avoid duplicative analysis." *Caudill v. Hollan*, 431 F.3d 900, 911, fn. 10 (6ᵗʰ Cir. 2005); *Miller v. Administrative Office of Courts*, 448 F.3d 887, 894 (6ᵗʰ Cir. 2006).

Defendants make much of the validity of the *Terry* stop, but do not discuss the inherent factual discrepancies surrounding Melendez's claim that he saw the Plaintiff throw a gun to the ground. Since there is a patent issue of fact as to whether Defendants Melendez and Weiss planted the gun and fabricated the accusations about the Plaintiff out of whole cloth, with Bradley's encouragement and support, the defense of qualified immunity must necessarily fail as a basis for summary judgment.

Defendants argue that under the first prong of *Saucier*, the Plaintiff's constitutional rights were not violated. Again, their argument is erroneously focused on the validity of the *Terry* stop, rather than the concocting of a false gun charge. As to the latter, it hardly requires the citation of case law to posit that a police officer's planting evidence and committing perjury in order to "frame" a suspect is a violation of the Due Process Clause. Nevertheless, the Supreme Court did hold in *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942), that "perjured testimony knowingly used by the state authorities to sustain [defendant's] conviction" and "deliberate suppression by these same authorities of evidence favorable to him" violates the Constitution. *See also Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (suppression of exculpatory evidence–e.g., that the police witnesses lied–violates Due Process).

Nor can it be seriously argued that the right to not be deliberately and falsely accused by the police is not clearly established. Indeed, the underlying principle that "Thou shalt not bear false witness against thy neighbor" is part of the fabric of our culture, and considerably predates even the Supreme Court's decision in *Pyle. See* Exodus 20:13.

-18-

The alleged police misconduct in this case falls well outside even the most expansive definition of "objective reasonableness." The Defendants are not entitled to qualified immunity.

## City of Detroit [Docket #102]

Defendant City of Detroit seeks summary judgment on two general grounds. First, citing *Watkins v. City of Battle Creed*, 273 F.3d 682, 687 (6th Cir. 2001), the City argues that the individual Defendants Melendez, Weiss and Bradley did not violate any of Plaintiff's constitutional rights, and therefore the *sine qua non* of municipal liability is absent. Secondly, the City argues that pursuant to *Monell v. Department of Social Services of City of New York* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), it has no *respondeat superior* liability, even assuming that its officers acted improperly.

For the reasons discussed in the preceding sections, the Court must reject the argument that there was no underlying constitutional violation. The more pertinent issue is whether the City has liability under *Monell*.

In *Monell*, the Supreme Court held that under § 1983, municipal liability is not unlimited, and that a municipality could not be liable on a theory of *respondeat superior*: "A municipality cannot be held liable *solely* because it employs a tortfeasor - - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*, 436 U.S. at 691, 2036. (Emphasis in original). However, the *Monell* Court found that when the acts of individual employees represent the government's custom or policy, the municipality can be held liable. *Id* at 638, 2037-2038.

In *Johnson v. City of Detroit*, 944 F.Supp. 586, 598 (E.D. Mich. 1996), the Court explained, "The requirement of an official policy distinguishes the acts of the employee from those of the municipality, ensuring that the municipality is held responsible only for the latter."

Nevertheless, a municipal policy need not be formal or written to bring § 1983 into play. It can be found in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)(citations omitted). In addition, § 1983 liability can be based on a policy of inadequate training or supervision, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Further, in *Memphis, Tennessee Area Local, American Postal Workers Union*, 361 F.3d 898, 902-903 (6th Cir. 2004), the court found that "[a] municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *See also Fletcher v. O'Donnell*, 867 F.2d 791,792-794 (3rd Cir. 1989). If it is shown that the City of Detroit "knew or reasonably should have known" that the actions of its police officers were unlawful, this would support a claim that the city was "deliberately indifferent" to the rights of Plaintiffs, which in turn "can be properly thought of as a city policy or custom that is actionable under § 1983." *Memphis* at 904.

Under the *Memphis* standard, the Plaintiff has shown sufficient facts to withstand

-20-

summary judgment, that is, there is a question of material fact as to whether the City of Detroit knew or should have known that its police officers, including the Defendants, were acting unlawfully, and therefore that the City was deliberately indifferent to the Plaintiff's rights.

Context is important. Here, the individual Defendants' actions were part of an alleged pattern and practice of police misconduct that a federal grand jury found to have involved at least *seventeen police officers* from Detroit's Fourth Precinct.[14]  As early as 1997, the City commissioned the so-called "Bobb Report" (*Plaintiff's Response to City of Detroit's Motion for Summary Judgment*, Exhibit A), to examine and make recommendations to address its extremely high costs in settling police misconduct lawsuits.[15]  The lengthy and widespread nature of the alleged misconduct in the Fourth Precinct, coupled with the City's recognition as far back as 1997 that there was an abnormally high number of police misconduct lawsuit settlements, adds force to the theory that the City knew, or at least should have known, that police misconduct was pervasive, and therefore should be scrutinized and investigated with an exceptional degree of attention.

---

[14] At oral argument, counsel for the City indicated that 19 officers from the Fourth Precinct were implicated in the investigation.

[15] Defendant City of Detroit challenges the authenticity of the document submitted by Plaintiff.  For purposes of this Report and Recommendation, the Court finds that the Plaintiff has demonstrated a question of material fact as to municipal liability without regard to the substance of the "Bobb Report," and therefore, the contents of Plaintiff's Exhibit A will not be considered.  Rather, it is the *existence* of a City-commissioned report on police misconduct settlements that is one of several factors that play into the existence of factual disputes

Within that context, the facts support a finding that the City should have known of, but was deliberately indifferent to, problems with the individual Defendants in this case. For example, Brian R. Stair, a Detroit Police Commander in charge of Internal Affairs (IA), states in his affidavit[16] that in 2002, federal authorities contacted the Detroit Chief of Police regarding a number of officers, including Defendant Bradley, and as a result, a Joint Investigative Task Force (JITF) was formed, to which Commander (then Lieutenant) Stair was assigned. The JITF reviewed records of arrests out of the Fourth Precinct–*records going back several years*– and noted "patterns that seemed to indicate some officers in the Gang Squad and in Fourth Precinct Special Operations frequently falsified reports of arrests." *Stair Affidavit*, ¶¶ 2-3. The review of those records prompted further investigation, including interviews of arrestees, that led the JITF to the conclusion that there was a pattern of police misconduct, including falsification of police reports. *Id.*, ¶ 7. Thus, while the federally-inspired task force's investigation may have commenced in 2002, the ultimate decision to proceed with the indictment of the Defendants was based on a collection of false police reports that stretched back for years. This was information that was available to the same high-ranking City officials who commissioned a report based on their concern about excessive police misconduct settlements. That the City had access to this information, but chose to not investigate until prodded to do so by federal authorities, creates at least a question of fact as to whether the City was deliberately indifferent.

_____

[16] Attached to City of Detroit's motion for summary judgment as Exhibit G.

This question of fact is made more apparent by the Defendant City's Supplemental Response to Plaintiff's First Set of Request to Admit (Exhibit 3 to *Defendant's Reply Brief*, Docket #121).  In those Requests, Defendant City admitted that Officers Melendez, Weiss and Bradley all qualified as "repeat offenders" in a study utilized by the Detroit City Council's Research and Analysis Division, and that such "repeaters" accounted for more than 111 million dollars of the 188 million dollars payed out in police misconduct settlements since 1987.  More specifically, the City admitted in Request for Admission No. 19 "that the Detroit Police Department and/or its members, representatives, appointees, agents or employees, either collectively or independently and during the years 1987-2004, knew and/or should have known that the Detroit Fourth Precinct had more than three (3) 'repeaters'  (or officer(s) who have been named in more than one (1) case, at any given time, during said period)."  This Defendant also admits, in Requests Nos. 26 to 36, that from at least prior to 1990 through the filing of this lawsuit, the City had "a computerized tracking system that would monitor officers' performance and flag potentially dangerous and/or constitutionally [sic] behavior and/or misconduct of police officers."

These facts show that for years before Plaintiff Chancellor's arrest, the data and information necessary to ferret out the pervasive misconduct in the Fourth Precinct was available to the City, and City had the technical means to gather and analyze this information, much as the Detroit-Federal JITF did.  Again, that it did not do so creates a question of fact

at to its deliberate indifference.[17]

The point is not that the Plaintiff has shown beyond peradventure that the City of Detroit has liability under *Monell*, or that the City has no viable defense. Were that the case, summary judgment would be available to the Plaintiff.[18]  Rather, the Plaintiff has done all that is required to defeat a Rule 56 motion–he has shown a question of material fact. Accordingly, summary judgment is inappropriate.

## B.   The State Law Counts

In addition to his federal claim under 42 U.S.C. §1983, Plaintiff has pled five Michigan state law claims, naming the three individual Defendants Melendez, Weiss and Bradley: false arrest and imprisonment; civil conspiracy; intentional infliction of emotional distress; malicious prosecution; and abuse of process.

The Defendants seek dismissal of the state law counts on the ground of immunity under Michigan's Government Tort Liability Act (GTLA), M.C.L. 691.1407.  This statute provides that state or local governmental agents or employees (including police officers) are "immune from tort liability for an injury to a person or damage to property caused by the

---

[17]In *Martini v. Russell*, 582 F.Supp. 136, 142 (C.D. Cal. 1984), the court held that even "a single unusually egregious incident can be sufficiently out of the ordinary to merit an inference that it was attributable to the inadequate training or supervision amounting to gross negligence on the part of the officials in charge" (citing *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.1980)).  If that is so, then the sheer number and nature of egregious violations committed by rogue officers over this period of time would even more clearly support an inference of municipal liability.

[18] Plaintiff has not filed a summary judgment motion.

officer, employee, or member while in the course of employment or service...."  However, §1407(2)(c) excludes from immunity protection acts which amount to "gross negligence." In addition, § 1407(3) specifically states that any grant of immunity contained in the statute "does not alter the law of intentional torts as it existed before July 7, 1986."  Thus, if a plaintiff alleges an intentional tort for which an individual police officer would have been liable before July 7, 1986, that officer is not entitled to governmental immunity under the statute.  *Lucas v. Monroe County*, 203 F.3d 964, 979, fn. 8 (6th Cir. 2000); *Koehler v. Smith*, 1997 WL 595085 (6th Cir. 1997) ("Michigan does not immunize its governmental employees, including police officers, from their intentional torts"); *Sudul v. City of Hamtramck*, 221 Mich.App. 455, 562 N.W.2d 478, 479 (1997) ("[a]n individual employee's intentional torts are not shielded by our governmental immunity statute").

As with their qualified immunity argument, the Defendants' claim of immunity proceeds from the erroneous premise that there is no question of fact as to whether Plaintiff actually possessed the gun claimed to have been found on the Clippert Street lawn.  As discussed in the preceding sections, however, the record is replete with evidence that could support a finding that the Defendants intentionally planted the evidence with the intent to falsely accuse the Plaintiff.  This makes the state law claims intentional torts, which are excluded from the GTLA.  Hence, the Defendants are not protected by governmental immunity.

Furthermore, the facts that support the §1983 count also support each of the state law counts.

### 1.    False Arrest and Imprisonment

To make out a claim of false arrest or false imprisonment, "the plaintiff must show that the arrest was not legal, i.e., that it was made without probable cause." *Tope v.Howe*, 179 Mich.App. 91, 105, 445 N.W.2d 452 (1989).  If the Plaintiff's facts are accepted, there was no probable cause other than that which was falsely concocted by the Defendants.

### 2.    Civil Conspiracy

The elements of a civil conspiracy are: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means.  *Admiral Insurance Co. V. Columbia Casualty Insurance Co.*, 194 Mich.App. 300, 313, 486 N.W.2d 351 (1992).  In this case, there are facts that show that three Defendants worked together to construct a false gun charge against the Plaintiff by planting evidence, an unlawful purpose committed by unlawful means.

### 3.    Intentional Infliction of Emotional Distress

To establish a Michigan common law claim of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress."  *Graham v. Ford*, 237 Mich.App. 670, 674, 604 N.W.2d 713 (1999).  *See also Roberts v. Auto-Owners Insurance Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985).  Liability under this theory requires that the conduct complained of "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham*, 237 Mich.App. at 674.  This is a demanding

-26-

standard: It is not sufficient to show that the defendant acted tortiously, intentionally, or even criminally. *Id.* The test has been described as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts*, 422 Mich. at 603.

The Plaintiff in this case has stated and factually supported a claim that Detroit Police Officers intentionally planted evidence and lied in their police reports, resulting in his being indicted and incarcerated for a lengthy period before the charges were dismissed. The officers themselves were indicted, based in part on their actions in Plaintiff's case. It is fair to say that the average citizen would characterize the Defendants' conduct as outrageous.

### 4.    Malicious Prosecution

In *Matthews v. Blue Cross Blue Shield of Michigan*, 456 Mich. 365, 378, 572 N.W.2d 603 (1998), the Michigan Supreme Court described the following elements of malicious prosecution: (1) that the defendant initiated a criminal prosecution against the plaintiff, (2) that the criminal proceedings terminated in the plaintiff's favor, (3) that the person who initiated the prosecution lacked probable cause to do so, and (4) that the action was taken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. In the present case, the factually supportable allegations against the Defendant police officers establish a classic case of malicious prosecution under this standard.

### 5.    Abuse of Process

In *Friedman v. Dozorc*, 412 Mich. 1, 30, 312 N.W.2d 585 (1981), the court set forth

the following elements of the tort of abuse of process:

> "To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding."

In *Vallance v. Brewbaker*, 161 Mich.App. 642, 646, 411 N.W.2d 808 (1987), the court explained that "[a] meritorious claim of abuse of process contemplates a situation where the defendant has availed himself of a proper legal procedure for a purpose collateral to the intended use of that procedure...." In the present case, the Plaintiff's facts support a finding that the Defendants committed an improper act in the use of process (knowingly filing a false police report), and that they had an ulterior purpose (causing the Plaintiff to be prosecuted and jailed even where there was no legitimate probable cause to charge him with a crime).

In summary, the Plaintiff has demonstrated questions of material fact as to each element of each state law claim. Since the Defendants are not entitled to governmental immunity for these intentional torts, summary judgment must be denied.

## IV.   CONCLUSION

For these reasons, I recommend that all three motions for summary judgment [Docket Nos. 102, 103 and 104] be DENIED as to all claims except the Fourteenth Amendment Equal Protection claim brought under 42 U.S.C. §1983, and that the motions be GRANTED as the Equal Protection claim only.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R.  Steven Whalen
R.  STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 29, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 29, 2006.

-29-

S/G.  Wilson
Judicial Assistant